Filed 3/25/21  In re J.R. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Laws | A159700 |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>F.L.,<br><br>        Defendant and Appellant. | (Contra Costa County<br>Super. Ct. No. J16-01169) |

In this juvenile dependency matter, F.L. (Father) appeals from an order denying his petition under Welfare and Institutions Code section 388 without an evidentiary hearing.  He contends the court erred because he made a prima facie showing that his daughter, J.R., should be removed from her current foster home placement.  We will affirm.

1

# I. FACTS AND PROCEDURAL HISTORY

In December 2016—over four years ago—the Contra Costa County Children and Family Services Bureau (Department) filed petitions under Welfare and Institutions Code section 300, subdivision (b) on behalf of J.R., born in November 2014, and her half-sibling V.H.[1]  The petition alleged that on December 18, 2016, M.M. (Mother) used inappropriate discipline when she kicked J.R. on her buttocks, causing her to fall, and Mother had reported she was depressed and not taking prescribed medication.  The petition further alleged that in June 2016 Mother and Father engaged in domestic violence in J.R.'s presence, while Father was under the influence of alcohol.

## A. Jurisdiction

In March 2017, the court sustained allegations of Father's alcohol or substance abuse problem and the parents' domestic violence.  In May 2017, the court sustained allegations as to Mother.

## B. Disposition

By the time of the disposition hearing in August 2017, J.R. was in a foster home.  A mental health clinician believed J.R. had mental health issues that needed to be addressed, and the social worker had requested an immediate referral to therapy.  Father consistently visited J.R., but J.R. avoided interacting with him.  Mother's visitation had not been consistent.

At the disposition hearing, the court found J.R. was a dependent child and there was a substantial danger of harm if she were returned to either parent.  The court ordered reunification services, including visitation, for Mother and Father.

---

[1]    All statutory references are to the Welfare and Institutions Code.

2

C. <u>Six Month Review Hearing</u>

In its January 24, 2018 six-month review report, the Bureau recommended that services be terminated as to Mother and continued as to Father. Mother had been arrested in November and December of 2017 for incidents of domestic violence, in which she was the aggressor. J.R. remained in the foster home and had been in individual therapy since October 2017, but continued to have nightmares and appeared fearful of men. Father visited J.R. consistently, and J.R. seemed to enjoy visits with him. Father continued to attend domestic violence classes and had recently begun parenting classes. He understood the consequences of his actions and how they could negatively affect a child. He was remorseful for his part in the children witnessing domestic violence.

At the review hearing on March 23, 2018, the court continued J.R. as a dependent in the Department's care and custody for placement pursuant to section 361.2, subdivision (e), finding that a return to parental custody would create a substantial risk of detriment. The court noted that Father had visited consistently and made significant progress in services, and there was a substantial probability of J.R.'s return to him. The court terminated Mother's services, extended Father's services, and continued visitation with both parents.

D. <u>Subsequent Review Hearings and August 2019 Order</u>

For a combined twelve-month and eighteen-month review hearing, the Department recommended that the court terminate Father's reunification services and set a section 366.26 hearing. J.R. was a special needs child, in therapy, and learning sign language. She twice stated that Father touched her vagina and anus area, but an investigation determined the allegations were unfounded. Father had completed a parenting class, but the

3

Department had not received documentation of his participation in a domestic violence and anger management program, and he "no-showed" for 10 drug tests and tested positive twice, admitting that he relapsed on methamphetamines in May 2018 due to stress. Father still indulged in substance abuse and failed to address how his behavior could affect J.R.'s well-being.

The matter was set for a contested hearing, which was held on several dates over the course of 10 months as a combined 12, 18 and 24-month review hearing between October 2018 and August 2019. The court heard testimony from the social worker and received reports and memoranda regarding reasonable services and Father's compliance with his case plan. Topics included Father's visitation and J.R.'s reactions (as well as an investigation of her statement that "Poppi touched me"); J.R.'s past and current trauma, her current mental health symptoms, and recommended treatment; and J.R.'s medical special needs and necessary surgeries.

In addition—as particularly relevant to this appeal—the hearings addressed the situation in J.R.'s foster home. At the hearing on November 14, 2018, it was disclosed that a child who lived in the home had been removed after he sexually abused another resident (his brother) in July 2018. J.R. and her half-sibling reported no inappropriate touching, however, and the foster parents had demonstrated "protective capacity" in their response to the incident.

The July 2018 incident was addressed again at a hearing on February 2019, when the social worker testified that after learning of the investigation, she interviewed J.R. and her half-sibling and both said they had not been left alone with those minors. The July 2018 incident was mentioned again at a hearing on June 26, 2019.

4

In its memorandum to the court for a hearing on August 2, 2019, the Department addressed the foster home being investigated for child abuse as previously reported. The Department recounted the following. In July 2018, Stanislaus County Children Services had received a referral alleging that a 15-year male had forced his 16-year male brother to perform oral copulation, and that these minors were the foster parents' adopted children. The offender was removed from the home as soon as the foster parents learned what happened, detained at juvenile hall, and then released to live elsewhere and ordered not to have contact with children under 14 unless supervised by an adult. The victim continued to remain in the home. J.R.'s half-sibling denied allegations of abuse at the time of Stanislaus County's investigation, but J.R. was just three years old and unable to answer. The Department later interviewed J.R. and her half-sibling, both of whom denied any form of abuse in the home and reported being safe.

At the hearing on August 2, 2019, the investigation of the July 2018 sexual abuse incident was again mentioned. There was further discussion as to whether the foster mother had walked in on the purported sexual abuse.

Also at the hearing on August 2, 2019, it was reported that the foster mother had made statements to J.R. about Father. Before a visit on June 15, 2019, the foster mother told J.R., "I know you don't want to be here but it's the law." On June 29, 2019, the foster mother told J.R. not to sit next to Father and give him kisses. On July 17, 2019, J.R. stated that the foster mother said J.R. did not have to hug or hold Father.

The contested review hearing concluded on August 16, 2019. The juvenile court observed that court-ordered therapeutic visits had not yet started, Father had been subjected to a truncated visit schedule without any evidence that he had abused J.R. sexually, and the Department needed to

5

determine whether J.R. had been encouraged to say she had issues with Father and if the foster parents were trying to alienate her from Father. At the end of the hearing, the court ruled that Father had "not been [provided] reasonable services . . . for the last six months" and it was in J.R.'s best interest to extend services to Father for another six months. It ordered that an upcoming CFT meeting include a discussion of what was going to happen with J.R.'s placement, as well as other issues. The court "direct[ed] the Department to have high scrutiny regarding the efficacy of [J.R.] and her sibling staying in the home." And it ordered that Father needed a substance abuse assessment, needed to continue testing consistently, and needed to show he can get J.R. to her medical appointments.

E. <u>Additional Hearings and the Department's Investigation Report</u>

In an October 3, 2019 memorandum (for an interim hearing held on October 4, 2019), the Department reported that its investigation of J.R.'s foster home was nearly complete; there was no evidence to support the allegations of sexual abuse to J.R. or her half-sibling in the home; the foster parents acted in protective ways when they discovered the abuse in the foster home; "there are no current safety risks in the home to [J.R.];" the Department was unable to determine whether J.R. had been intentionally or unintentionally "coached" by the foster parents; and it was "clear through [J.R.]'s statements she wants to stay with her current caregivers." The Bureau believed the placement with the foster family was in J.R.'s best interests "given that she is stable in placement, there are no observed safety concerns or risks, she is bonded to her caregivers and her older sister who is also in the home with her," and the "foster parents are in-tune with all the current extensive medical needs and she is being cared for more than adequately in this home."

6

The Department thereafter issued its "Foster Family Agency Investigation" report, dated October 9, 2019, addressing the allegations of sexual abuse and general neglect. The report recounted earlier investigations of sexual abuse or neglect allegations concerning the foster home: allegations of sexual abuse had been substantiated as to an incident in August 2005 (a foster child sexually abused the caregiver's adopted child and another foster child) and November 2005 (another victim of the offender was identified); a general neglect allegation in 2005 was determined to be "unfounded;" an allegation of sexual abuse in July 2018 was found to be "inconclusive;" and an allegation of sexual abuse in April 2019 was "evaluated out" or "inconclusive."

As to the subject of the current investigation—the July 2019 allegation of sexual abuse upon J.R. and her half-sibling by an unknown perpetrator—the Department determined that the allegations were "unfounded." Neither V.H. nor J.R. disclosed sexual abuse by anyone at their foster home, and there was "no evidence" that they had been sexually abused.

As to the allegation of general neglect based on the concern that the foster parents had "coached" J.R. against Father, the Department deemed the allegation "inconclusive." The Department explained: "It is not clear if [J.R.] was intentionally or unintentionally coached. However, there is a strong[] belief that [J.R.] is putting information together and saying these things so she does not have to go home with her father. The terminology [J.R.] uses to speak about her father reveals that she knows too much about the case, however, it is not clear if [J.R.] overhears these statements or if she is spoken about things directly by her foster parents. It is also possible that she is putting together information that she is told by other professionals in her life, including the Bureau's social workers."

As to the general neglect allegation related to the alleged sexual abuse in 2018, the Department concluded: "It does not appear that the caregivers failed to protect [V.H.] or [J.R.]. The caregivers addressed the behaviors, sought out the police to make a report and have made a plan for the perpetrator to be cared for outside of their family home. They had notified the assigned social worker and allowed access to the children without question to ensure that they were safe."

On October 25, 2019, the court ordered that a redacted version of the report be provided to Father's counsel.

At the November 1, 2019 hearing, the court ordered Father to undergo a drug assessment, ordered family therapy with a licensed therapist, and ordered the case plan as modified. The court determined that a return of J.R. to Father would create a substantial risk of detriment, and warned that the court would make a permanent plan for J.R. if Father was unable to resume custody by the next review hearing.

F.  Father's Section 388 Petition

On November 22, 2019, Father filed a petition pursuant to section 388 for a change of J.R.'s placement. His petition—the subject of this appeal—requested a change in the juvenile court's order of August 16, 2019 to the extent it had directed the Department to have "high scrutiny regarding the efficacy of [J.R.] and her sibling staying in this home." Father asked the court to move J.R. from her foster home to a "safe" home where reunification would be supported.

Father's petition noted that the FFA Investigation Report included new and previously undisclosed information, including the two substantiated reports of sexual abuse in 2005. Counsel also noted that, according to the FFA Investigation Report, J.R.'s foster mother had told J.R. in June and July

8

2019 not to sit next to Father or give him kisses, she did not have to hug Father, she should not eat Father's junk food, and the law required her to visit Father even though she did not want to. In addition, the FFA Investigation report stated that, according to J.R., the foster father said not to play with Father.

The court held a hearing on December 20, 2019, to decide whether to set an evidentiary hearing on Father's section 388 petition. Father (through counsel) acknowledged that he was requesting immediate removal of J.R. from her caregivers and urged that the petition met the requirements for an evidentiary hearing. Minor's counsel and Deputy County Counsel, on behalf of the Bureau, argued there was neither changed circumstances nor new evidence and the requested change in the order was not in J.R.'s best interest.

The court denied Father's section 388 petition without an evidentiary hearing. Because the placement in the foster home was not made by a court order, the court believed there was no prior order to modify. Moreover, the court ruled, the petition did not meet the requirements for an evidentiary hearing.

As to the requirement that the proposed modification be in the child's best interests, the court found that it could "not even under a prima facie standard believe [that it] would be in [J.R.'s] best interest to rip her from a placement that she's been in now for several years with her sibling and put her in yet another stranger foster home."

Regarding the requirement of a change of circumstances or new evidence, while the petition set forth some additional information about a 2005 investigation of the foster home, the court and counsel "knew about" the

9

more recent allegations of the home as discussed at prior hearings, and the petition had not asserted "enough new information."

This appeal followed.

## II.  DISCUSSION

Father contends the juvenile court erred in denying his section 388 petition without an evidentiary hearing.  We disagree.

### A.  Applicable Law

Under section 388, subdivision (a)(1), the parent of a dependent child of the juvenile court "may, upon grounds of change of circumstance or new evidence," petition the juvenile court "for a hearing to change, modify, or set aside any order of court previously made."  Although usually used to attack a court order of placement, a section 388 petition may also be used to challenge the Department's determination to leave a child in a placement.  (*In re Matthew P.* (1999) 71 Cal.App.4th 841, 848–849.)

If the section 388 petition does not make a prima facie showing that there is new evidence or a change of circumstances since the prior order, *and* that a modification of the order is therefore in the child's best interest, the petition may be denied without an evidentiary hearing.  (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 323; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431–432; Cal. Rules of Court, rule 5.570(d) [petition may be denied ex parte if it does not show that the change would promote the child's best interests].)

A section 388 petition is liberally construed in favor of granting a hearing.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309; Cal. Rules of Court, rule 5.570(a).)  On the other hand, "[t]o support a section 388 petition, the change in circumstances must be substantial."  (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)  We review the court's decision not to hold a hearing for an abuse of discretion.  (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

10

B. Change of Circumstances or New Evidence

The court's finding that Father's petition did not adequately present a change of circumstances or new evidence is supported by the record. The 2018 sexual abuse had been discussed at hearings that took place before the August 2019 order. Although the FFA Investigation report disclosed a more recent allegation of an April 2019 incident, that allegation was "evaluated out" or "inconclusive." It also referred to incidents in 2005, but those occurred more than a decade before J.R. started living there. It was reasonable for the court to conclude that such evidence was insubstantial, particularly given statements by J.R. and her half-sibling that they had not been sexually abused, were not left alone with the 2018 offender, and felt safe, and the determination that the foster parents had protected them. As to the foster parents' statements to J.R. about Father, many of those statements had come to light before the August 2019 order and had been considered in the court's formulation of that order. It was reasonable to conclude that the more recent remarks were inconsequential, since J.R. was visiting with Father and the visits were going well. Furthermore, as the court pointed out, the parties had reached an agreement that they would not discuss the case, including Father.[2]

Father argues that the change of circumstances was the Department's decision to continue J.R.'s placement in the foster home despite the evidence in its investigation report. In other words, Father urges that the August

---

[2]     We also note the importance of viewing the foster parents' statements in context. For example, the actual entry regarding the foster mother's statement on June 15, 2019, was this: "[Father] arrives at 9:05pm [¶] [J.R.] arrives at 9:13am [¶] [J.R.] hugs onto caregiver and caregiver says, 'I know you don't want to be here but it's the law. *It's only an hour. Go.*' [J.R.] walks towards [Father]." (Italics added.) From this record, it appears that the foster mother *facilitated* the visit with Father.

11

2019 order requiring the Department to give high scrutiny to whether J.R. should remain in the foster home must be changed because the Department did, in fact, scrutinize whether J.R. should remain in the foster home and concluded that she should. Father may not like the Department's conclusion, but he fails to establish an abuse of discretion by the court. Reading the section 388 petition liberally, Father failed to show any substantial change of circumstances. (See *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223.)

C. J.R.'s Best Interests

The court found that Father failed to make a prima facie showing that the proposed modification—removing J.R. from her long-standing placement—would be in J.R.'s best interests. Overwhelming evidence supported this conclusion.

J.R. had been living in her foster home, with the foster mother and father, since February 2017—about half her life. Her older half-sibling lived there as well. She was a special needs child. She was stable in the foster home and had bonded with her caregivers. Both J.R. and her half-sibling told the Department they felt safe there. The FFA investigation confirmed that J.R. and her half-sibling were safe and the caregivers had not failed to protect them. The foster parents were handling J.R.'s extensive medical needs, and their care was deemed more than adequate. It was reasonable to conclude that moving J.R. from her stable long-term home to a new foster placement with strangers would be disruptive if not detrimental to her, and moving her to Father's care was not a viable option since the court ruled—and Father does not dispute—that returning J.R. to Father posed a substantial risk of detriment.

Father complains that the court focused its best interest assessment on the reasons not to remove J.R. from the foster home, without addressing her

12

interest in reunifying with Father. (Citing *In re William B.* (2008) 163 Cal.App.4th 1220, 1227 [under the overarching goal of a child's best interests are child safety, family preservation, and timely permanency and stability]; *In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55 [child must be placed in a safe home]; but see *In re Ernesto R., supra,* 230 Cal.App.4th at p. 224 [defining best interests in § 388 context].) However, based on the record presented in this appeal, the juvenile court consistently expressed concern about Father having a lawful and fair opportunity to reunify with J.R., going so far as to extend reunification services *beyond the 24-month period* to make sure Father had received or been offered reasonable services.

Father nonetheless points to evidence that, according to him, shows the foster parents were affecting his "bond" with J.R.: J.R. told the social worker in March 2019 that she did not like Father and did not want to see him; she told Father at a June 29, 2019 visit that she did not want to live with him but was unable to explain why (at less than five years old); she told the social worker on September 13, 2019 that she was afraid of Father because he let her play on his phone; and she stated on September 18, 2019 that she did not like Father, he hit her with his shoe, and he was mean, but she could not articulate how. But none of this evidence suggests that J.R.'s foster home was the impediment to reunification. To the contrary, by the time the section 388 petition was denied, the visits between J.R. and Father were consistent, the visits were going well, J.R. seemed to enjoy the visits, and she used a teddy bear during a visit to say "I love you" and hugged Father after he gave her a snack. Viewing the allegations of the petition liberally, there is ample support for the court's conclusion that Father failed to make a prima facie showing that a placement change would be in J.R.'s best interests.

13

Father further contends the juvenile court should have continued to investigate the concerns it expressed about the home at the August 16, 2019 hearing. The inference from the record, however, is that the court's concerns were satisfied—and reasonably so—by the conclusions the Department reached after its extensive investigation. Father fails to establish that the court abused its discretion by denying the section 388 petition without an evidentiary hearing.

Finally, Father fails to show that the court's decision not to hold an evidentiary hearing was prejudicial. The evidence on which Father relied in urging a change of placement was attached to the section 388 petition, and there was no offer of proof concerning significant oral testimony or other evidence that would be presented if an evidentiary hearing were held. Since the court was unpersuaded by the evidence accompanying the petition, the record discloses no likelihood that the court would have been persuaded after a full hearing.

## III.  DISPOSITION

The order is affirmed.

_____
NEEDHAM, J.

We concur.


_____
SIMONS, Acting P. J.



_____
BURNS, J.



*In re J.R.* / A159700